UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN HORANZY, individually and on behalf of all others similarly situated, )<br><br>Plaintiff, )<br><br>v. )<br><br>VEMMA NUTRITION COMPANY, BENSON K. BOREYKO, and YIBING WANG, )<br><br>Defendants. ) | Civil Action No.  7:14-CV-1296 (DNH/TWD)<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff John Horanzy ("Plaintiff" or "Horanzy") brings this action on behalf of himself and all others similarly situated against Vemma Nutrition Company, Benson K. Boreyko, and Yibing Wang ("Defendants").  Plaintiff makes the following allegations based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.  Plaintiff alleges as follows:

## NATURE OF THE ACTION

1.      This is a class action lawsuit against Defendants for the false and misleading marketing, advertising, and sale of their Vemma product line, including Vemma, Vemma Mangosteen with Essential Minerals, Vemma Renew, Vemma Next, and Vemma Verve products (collectively, the "Products").  The Products are marketed and sold as liquid dietary supplements and uniformly attribute their "effectiveness" to the Southeast Asian fruit Garcinia mangostana, colloquially known simply as "mangosteen."  Vemma, the name shared by both Defendant Vemma Nutrition Company and the Products themselves, stands for Vitamins Essential Minerals Mangosteen Aloe.

2.      On the labeling and packaging of the Products, Defendants state that each of the Products contains an identical "clinically studied" and "doctor formulated" formula.  Defendants claim that the Products' formula has been clinically proven to show that (1) the Products cause "a significant decrease in C-reactive protein and a significant improvement in immune system function"; (2) the Products reduce C-reactive protein levels from "high risk range" to "low risk range"; (3) the Products caused the "Lowering of C-reactive protein"; (4) the Products "Increase[] ORAC blood levels for 6 hours after intake"; (5) the Products "Increase[] vitamins and antioxidants in the blood"; (6) the Products "Enhance[] Immunity"; (7) the Products "Increase[] overall health status"; (8) the Products are "highly bioavailable"; (9) the Products cause "significant improvement in immune markers"; (10) the Products cause "superior antioxidant absorption"; and that (11) this "gold standard research" "confirms that consuming Vemma daily helps to strengthen the body's natural immune defense, which causes that people taking it maintain their vitality, and enhance quality of life."  In fact, there are no credible studies that "prove" any of Defendants' claims and the consensus of published research confirms that Defendants' claims are false.

3.      Defendants have also trained hundreds of thousands of their distributors to sell the Products using unlawful health claims, such as through the use of advertising and testimonials attesting to the Products' ability to cure, aid, alleviate, and prevent diseases.  For nearly a decade, Defendants have published and dispersed distributor manuals that specifically instruct distributors to sell the Products using unlawful health claims and related testimonials.

4.      Defendants' practices are particularly shocking because they violate a Federal Trade Commission injunction barring Defendants from using precisely these kinds of marketing claims.  Having been caught by the FTC selling supplements through the use of unlawful health

2

claims and testimonials in 1999, Defendants are well aware that their conduct violates federal and state laws and the FTC injunction levied against them.

5.     Plaintiff brings this action against Defendants in their individual capacities for direct involvement in the dissemination of the misleading claims at issue.  In the alternative, this Complaint also asserts alter ego allegations against Defendant Boreyko and seeks to pierce the corporate veil of Defendant Vemma Nutrition Company to reach Defendant Boreyko.

6.     Plaintiff seeks relief in this action individually, and on behalf of similarly situated purchasers of the Products for violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq*., New York General Business Law § 349, violation of New York General Business Law § 350, breach of express warranty, negligent misrepresentation, fraud, and unjust enrichment.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question).  This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

8.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000, exclusive of interest and costs, and Plaintiff, as well as most members of the proposed class, are citizens of states different from Defendants.

9.     This Court has personal jurisdiction over Defendants because Defendants conduct substantial business in the State of New York such that they have significant, pervasive and substantial contacts with the State of New York.  Further, Defendant Vemma Nutrition Company engaged in purposeful activities in the State of New York in relation to Plaintiff's transactions for the benefit of and with the knowledge and consent of Defendants Boreyko and Defendant

Wang.  Defendants Boreyko and Wang exercised significant control over Defendant Vemma Nutrition Company's transactions concerning Plaintiff's transactions.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within this District and because the Defendants are subject to personal jurisdiction in this district.

## THE PARTIES

11.     Plaintiff John Horanzy is a citizen of New York, residing in Colton, New York. Between 2008 and 2011, Plaintiff Horanzy purchased several sets of two bottles of Vemma Mangosteen with Essential Minerals for approximately $60, and individual bottles for approximately $30.  Plaintiff Horanzy purchased the products in person from one of Defendants' employees in New York, also known as Vemma affiliates, Vemma members, or Vemma distributors.  Prior to Plaintiff Horanzy's purchases, Plaintiff heard, read, and relied on Defendants' marketing representations on the products' labels, packaging, and online.  Before purchasing the products, Plaintiff Horanzy also read Defendants' representations making health claims concerning the products online, such as that the products could cure or alleviate diseases. The label of the product he purchased stated that the product was "CLINICALLY STUDIED" and "PHYSICIAN FORMULATED."  The packaging of the product contained a Vemma Formula Inside seal.  Plaintiff Horanzy relied on these representations in deciding to purchase the products.  The representations were part of the basis of the bargain, in that he would not have purchased the products or would have paid significantly less for the products had he known that the representations were misleading, fraudulent, false, and omitted material information. Plaintiff Horanzy consumed Vemma Mangosteen with Essential Minerals and did not obtain the

benefits that Defendants advertised, because the Products are not clinically proven as effective and do not work.  Plaintiff Horanzy has never purchased any of the Products for resale.

12.     Defendant Vemma Nutrition Company is an Arizona corporation with its principal place of business in Temple, Arizona.  At all relevant times, Defendant has done substantial business in the State of New York.  Vemma Nutrition Company does not sell the Products through traditional retail outlets, but instead sells the Products primarily through thousands of individual distributors, or employees, and online on its website.  Vemma Nutrition Company is the direct successor and assign of New Vision International.

13.     Defendant Benson K. Boreyko is the Chief Executive Officer and President of Vemma Nutrition Company.  Boreyko was also the CEO and President of New Vision International.  Boreyko and his two sisters, Lauren and Karen Boreyko are the sole owners of Vemma Nutrition Company.  Boreyko makes personal appearances on behalf of Vemma Nutrition Company throughout the United States, including New York.  Boreyko is engaged in and directs the design, manufacture, production, testing, study, inspection, mixture, labeling, marketing, advertising, sale, promotion and/or distribution of the Products.  Boreyko aided the creation of, encouraged, knew of, composed, and distributed distributor manuals instructing Defendants' distributors to advertise and sell the Products using unlawful health claims and testimonials, as described herein.  Boreyko conspired with, directed, encouraged, and aided Defendants' top distributors in the sale and marketing of the Products using unlawful health claims and testimonials.

14.     At all relevant times, Boreyko has been operating Vemma Nutrition Company as his alter ego.  Boreyko established Vemma Nutrition Company and New Vision International for an illegal purpose: to shield the real property assets used in the production of misbranded

Products from the reach of defrauded purchasers.  Boreyko totally dominates and controls Vemma Nutrition Company to such an extent that the independence of the entity is a sham.

15.     Defendant Yibing Wang is Vemma Nutrition Company's "Chief Scientific Officer."  Defendant Wang appears pervasively throughout Defendants' advertising, including his image, likeness, and endorsements.  Defendants use Wang's personal endorsement of the Products to market and sell the Products, to give the Products an aura of scientific and medical legitimacy, and to promote Defendants' "clinical studies" as legitimate and scientifically worthy. Defendants also use Defendant Wang's likeness and endorsement to market the Products as having been "PHYSICIAN FORMULATED."  Defendant Wang invented and formulated the Vemma formula, which is present in each of the Products, and continues to directly oversee the Products' formulation and production processes.

16.     At all relevant times, each Defendant acted in concert with, with the knowledge and approval of and/or as the agent of the other Defendants within the course and scope of the agency, regarding the acts and omissions alleged.

### FACTS COMMON TO ALL CAUSES OF ACTION

17.     Defendants are the poster child for greed run amok in the health supplement industry.  After being caught red-handed by the Federal Trade Commission nearly fifteen years ago for using the same illegal practices described herein, Defendants chose to wait, rebrand, and repeat.  This time, Defendants use two worthless studies, empty promises, and a business structure modeled as a pyramid scheme to swindle thousands of purchasers.

### A.     Vemma's False And Misleading Advertising

18.     The packaging for each of Defendant' Products bears what Defendants call the "Vemma Formula Inside" seal, reproduced below.  Defendants guarantee that any product bearing the Vemma Formula Inside seal contains an identical "**clinically studied** blend of 12

6

full-spectrum vitamins, plant-sourced minerals, mangosteen superfruit, organic aloe vera and

green tea in every serving." (emphasis added)



19.     Through a mass marketing campaign including websites, brochures, product

packaging and labeling, and through Vemma distributors following canned, scripted speeches

that trumpet the company message, Defendants warrant that each of its Products contains the

same "clinically studied" formula.  For example, the following advertisement is typical, showing

the Vemma, Vemma Next, and Verve products alongside the Vemma Formula Inside Seal:



20.     Defendants' Product labels also prominently feature representations that the Products have been "CLINICALLY STUDIED."  For example, images of Defendants' Vemma Renew and Vemma bottles bearing the "CLINICALLY STUDIED" representation are reproduced below:

 

21.     Defendants represent that the "Science" behind the "CLINICALLY STUDIED" "Vemma Formula" is identical for each of the Products.  In other words, Defendants advertise that each of the Products contains an identical "Vemma Formula" and that this formula has been

8

"CLINICALLY STUDIED."  An image from Defendants' website containing the message "The SCIENCE behind our CLINICALLY STUDIED Vemma Formula" is reproduced below:



22.     Defendants' multi-million dollar marketing campaign rests on the assertion that the Vemma Formula is "TESTED TO THE HIGHEST STANDARD OF CLINICAL RESEARCH",[1] and that the Products have been "tested to the gold standard of clinical research." Defendants use the "results" of two "studies" as "proof" of their baseless claims about the Products.  However, Defendants' "clinical research" is not of the "Highest Standard" and there is no "science" behind the "Vemma Formula."  In fact, the worthless research that Defendants' use to rope in purchasers does not come close to meeting the most fundamental prerequisites of proper clinical or scientific research.

---

[1] https://www.vemma.com/science/studied.cfm.

23.     Defendants further claim that these clinical studies were so rigorous that they were "harder to pass than the SATs, ACTs and GEDs combined."  Defendants claim that that the Products "passed with flying colors, of course!"

24.     Defendant Boreyko states in a video on the Products' website that he has put "hundreds of thousands of dollars into clinical science to prove what Vemma can do for you and your family."

25.     Defendants ubiquitously represent, through online advertising, promotions, brochures, its website, and through its sales representatives that these studies – purportedly representing the "HIGHEST STANDARD OF CLINICAL RESEARCH" – prove, among other things, that:

   a)  the Products cause "a significant decrease in C-reactive protein and a significant improvement in immune system function";

   b)  the Products reduce C-reactive protein levels from "high risk range" to "low risk range";

   c)  the Products caused the "Lowering of C-reactive protein";

   d)  the Products "Increase[] ORAC blood levels for 6 hours after intake";

   e)  the Products "Increase[] vitamins and antioxidants in the blood";

   f)  the Products "Enhance[] Immunity";

   g)  the Products "Increase[] overall health status";

   h)  the Products are "highly bioavailable";

   i)  the Products cause "significant improvement in immune markers";

   j)  the Products cause "superior antioxidant absorption"; and that

     k)   this "gold standard research" "confirms that consuming Vemma daily helps to strengthen the body's natural immune defense, which causes that people taking it maintain their vitality, and enhance quality of life."

26.     Defendants buttress their false and misleading claims about their biased studies by representing on Product packaging and online that the Products are "PHYSICIAN FORMULATED & CLINICALLY STUDIED." On Defendants' website, Defendants further represent that "By combining the extensive knowledge of Chief Scientific Officer, Yibing Wang, M.D., Ph. D., with his Eastern (**cardiology**) and Western (**genetic obesity**) wellness expertise, and the best experts in nutrition, weight management and fitness, we guarantee results-driven products that are true to what's listed on the label and a brand you can trust to enhance overall health" (emphasis added).

27.     Defendant Wang holds the title of "Vemma's Chief Scientific Officer," has an entire page on Defendants' website devoted to his endorsements of the Products, and is held out as the medical and scientific mastermind behind the Products. Defendants claim that "Dr. Wang continues to oversee the formulation process from conceptualization to production. He also ensures that all manufacturing practices are strictly adhered to in Vemma's GMP-certified facility."

28.     Next to a picture of Defendant Wang, Defendants' website reads in large bold print:

> **As a scientist and medical doctor, I formulated Vemma to be an ultra-premium nutrition blend that is quite possibly the most powerful liquid antioxidant available. The quantifiable data and positive results obtained from the two independent clinical studies attest that consuming Vemma on a daily basis increases immunity and supports an increase in vitamins and antioxidants through its highly bioavailable liquid form.**

29.     Defendants also use Defendant Wang's image to endorse their misleading studies. For example, Defendants' website shows an image of Defendant Wang next to the statement "It is rare in the wellness industry that a company would do clinical studies, simply because they're not required.  But to have two clinical studies done on the Vemma formula and have them published in peer-reviewed journals is absolutely huge."

30.     Directly below the above statement, Defendants' website prompts customers to click on a link titled "Read full letter from Dr. Yibing Wang."  Dr. Wang's letter reads in part that the "studies you are about to read give credence to the countless positive testimonials Vemma has received from customers over the years on its ability to help overcome challenges, increase vitality and enhance well-being."  Defendant Wang went on to state that these studies confirmed all of the representations found on Defendants' website.

31.     Defendants' use of Defendant Wang's image and endorsements to give the Products medical and scientific credibility is highly misleading.  The studies are extremely flawed and do not prove any of Defendants' marketing representations.  Further, Defendants' use of Defendant Wang's endorsements is part and parcel of Defendants' illegal marketing by using health claims and testimonials prohibited by Federal Drug Administration ("FDA") regulations.

32.     To further promote the fake science that supposedly supports Defendants' claims, Defendants also tout the Products' Oxygen Radical Absorbance Capacity (ORAC) that purportedly increases Vemma's "power to neutralize free radicals" and "prevent free-radical damage at the cellular level."  Defendants assert that their clinical study – the "Bioavailability Study" – proves that the "Antioxidant (ORAC) Capacity" increases in humans after consuming the Products.  Defendants state that the Bioavailability Study proves that "Vemma is shown to be highly bioavailable and provides…Increased ORAC blood levels for 6 hours after intake."

33.     The following chart, titled "**Antioxidant (ORAC) Capacity After Vemma**" (purportedly showing the results of the Bioavailability Study) is uniformly displayed throughout Defendants' advertising, including online.  The chart shows that persons who consume the Products purportedly experience higher "Antioxidant (ORAC) Capacity" over time, as compared to placebo.



34.     Defendants also advertise that the Products have a far greater ORAC value than any of their competitors' products, misleadingly suggesting that the Products are superior because of the higher ORAC value.  For example, Defendants advertise the following chart comparing the Products to that of their competitors:



35.     In addition, the following image showing that the Products have "over 4,800 ORAC UNITS appears on Defendants' website and in supplemental advertising:



36.     However, each of Defendants' representations concerning the Products' ORAC value, including the results of the Bioavailability Study, are false and misleading because the United States Department of Agricultures ("USDA") has established that ORAC values have absolutely no relation to human health and that a manufacturer's use of such claims is highly misleading.   Defendants' representations concerning ORAC values and the Bioavailability Study are also false and misleading as alleged below.  *See* Section B(3), infra.

**B.     Defendants' Flawed And Misleading Studies**

37.     Defendants' ubiquitously promote two self-funded studies as proof of all of their efficacy, health, and bioavailability claims through their website, online, sales representatives, brochures, pamphlets, and testimonials.  Each of these studies is highly flawed and does not prove any of Defendants' claims.  Defendants know that these studies are of no value but they

purposefully use them to market the Products to mislead consumers about the Products' efficacy, bioavailability, and health properties.[2]

38.     Defendants' base their marketing and advertising, including their assertion that the Products and the Vemma Formula have been "TESTED TO THE HIGHEST STANDARD OF CLINICAL RESEARCH," on only two studies that Defendants funded - The Bioavailability Study and the Immune Function Study.  For example, Defendants represent that "our Vemma formula has been subjected to the highest standard of clinical research – two independent, double blind, placebo controlled studies – in order to demonstrate the benefits it provides for overall health and wellness."  Defendants likewise claim that "Clinical studies are not mandated for wellness companies; however, we elected to put our flagship Vemma nutritional formula to the test.  The Vemma Clinical Trials were conducted by one of the industry's most widely recognized experts in independent clinical testing: Brunswick Laboratories of Massachusetts."[3]

39.     Every single one of Defendants' representations about its supposedly independent double-blind studies is false and misleading because Defendants' studies are biased, unreliable and unsound.  Defendants' use of these studies for the purpose of making these "showings" and "proofs" is likewise fraudulent and misleading.  In fact, published research directly refutes these claims.  Further, the data acquired from the small number of participants in the studies shows that there were no differences between the group that received the Vemma formula and the group that received the placebo.  To make matters worse, Defendants' studies are *not* independent.  While Defendants tout the legitimacy of these studies in part due to their being "independent," the studies

---

[2] Both studies tested only one of the Products, Vemma Mangosteen Plus with Essential Minerals. However, the so-called Vemma formula is the same in Mangosteen Plus as it is in the other Products at issue.
[3] *Id.*

15

were in fact initiated and funded entirely by Defendants and conducted in China, not Massachusetts.

40.      Studies that are actually conducted at the "Highest Standards" employ a Type I error rate adjustment (e.g., using a Bonferroni adjustment) to control for statistical significance that occurs by chance.  This standard adjustment was not used in either of Defendants' studies because employing the adjustment would have eradicated any findings of statistical significance.  In other words, all results from both studies would become clinically insignificant if a reasonable error rate is set and this standard procedure is followed.

41.      There is no research supporting, affirming, or replicating Defendants' "clinical" results because the two studies are fundamentally flawed, are not "proof" of any of Defendants' claims, and cannot be generalized to the population because the placebo and control groups in each study were too small.  None of Defendants' claims have ever been proven and, to the contrary, published research confirms that Defendants' claims that "high quality research" and "clinical studies" supports its baseless health claims is false and misleading.

42.      The authors of both of Defendants' cited published studies admit that aside from their non-generalizable results, no other human clinical studies have ever even attempted to assess whether mangosteen has any effect on immunity or bioavailability.[4]  For example, in Defendants' study titled *Bioavailability and Antioxidant Effects of a Xanthone-Rich Mangosteen (Garcinia mangostana) Product in Humans*[5] (the "Bioavailability Study"), the researchers state that "there have been no human bioavailability studies using commercial mangosteen juice to our knowledge."  In Defendants' study entitled *Effect of a Mangosteen Dietary Supplement on*

---

[4] The authors of the two studies are largely identical.  Miwako Kondo, Hong-Ping Ji, Yan Kou, and Boxin Ou are cited as authors of both studies.
[5] Miwako Kondo, Lilian Zhang, Hongping Ji, Yan Kou, and Boxin Ou, *Bioavailability and Antioxidant Effects of a Xanthone-Rich Mangosteen (Garcinia mangostana) Product in Humans*, J. Agric. Food Chem. Sept. 02, 2009.

*Human Immune Function: A Randomized, Double-Blind, Placebo-Controlled Trial*[6] (the "Immune Function Study"), the researchers likewise admit that their results were "demonstrated for the first time…in generally healthy adults."

### 1.     The Immune Function Study

43.     Defendants assert that the purpose of the Immune Function Study was to "evaluate how Vemma enhanced immune function and well-being in humans," and to examine "C-reactive protein response and immune-regulatory response in the human body."  Defendants claim that this study proves that the Products cause "a significant decrease in C-reactive protein and a significant improvement in immune system function," reduce C-reactive protein levels from "high risk range" to "low risk range," cause the "Lowering of C-reactive protein," "Enhance[] Immunity," "Increase[] overall health status," cause "significant improvement in immune markers," and that the study "confirms that consuming Vemma daily helps to strengthen the body's natural immune defense, which causes that people taking it maintain their vitality, and enhance quality of life."

44.     However, the Immune Function Study does not "prove" any of Defendants' claims and is highly misleading, because it is fundamentally flawed and is contradicted by established research.  As a result, Defendants have knowingly and intentionally misled consumers about the efficacy of the Products.

45.     The Immune Function Study suffers a major flaw due to its incredibly small sample size.  There were a total of only fifty-nine (59) participants, and, of those only thirty (30) participants actually consumed the Products.  A total experimental group of only thirty (30)

---

[6] Yu-Ping Tang, Peng-Gao Li, Miwako Kondo, Hong-Ping Ji, Yan Kou, and Boxin Ou, Effect of a Mangosteen Dietary Supplement on Human Immune Function: A Randomized, Double-Blind, Placebo-Controlled Trial, J. Med. Food, August 2009.

participants is far too little to make any generalization about the Products and cannot be used as "proof" of any of Defendants' claims.[7]

46.     Defendants advertise that the Immune Function Study proves that the Products cause "a significant decrease in C-reactive protein," reduce C-reactive protein levels from "high risk range" to "low risk range," cause the "Lowering of C-reactive protein" and use the following chart, titled "**C-reactive protein (CRP) is Reduced in Vemma Participants**", purportedly showing the results of the Immune Function Study to support their claims.



Immediately below the chart, Defendants assert that the "*Red shaded area indicates high-risk range (<1mg/L) of CRP levels.  White area is low-risk range of CRP levels.*  The **Vemma group** was the only group to **reduce** their CRP levels **from unhealthy to healthy** levels" (emphasis in original).

47.     Defendants' chart, however, evidences the study's serious methodological flaws. First, the chart highlights the fact that only a small non-representative group participated in the

---

[7] The Immune Function Study is also flawed because Defendants, and/or the researchers, intentionally selected an unrepresentative group of participants compared to the population as a whole.  By design, the Immune Function Study screened all participants to ensure that only those between the ages of forty (40) and sixty (60) could participate.

study.  Second, Defendants and the researchers are in effect admitting that even before

participants took the Products, their relative CRP levels were significantly different.  As the chart

clearly shows, participants in the "Placebo" group reported CRP levels roughly thirty-three (33)

percent higher than the "Vemma" group even before consuming any of the Products.  Such

variation inherently dooms the study and causes Defendants' representations that their Products

are supported by "high quality research" to be false and misleading.

48.     Problems concerning sample size and representativeness are also evident in the

fact that the "Placebo" group reported CRP levels of roughly 2 mg/L, whereas the average CRP

levels of middle-aged Americans is about 1.5 mg/L, a difference of about thirty-three (33)

percent.  Thus, Defendants may not use such an unrepresentative group to generalize about the

results of this study or offer this study as "proof" of any of their claims.

49.     Further, Defendants misrepresent that the "Red shaded area indicates high-risk

range (<1mg/L) of CRP levels."  Because the average CRP levels of middle-aged adults is about

1.5 mg/L, Defendants are essentially asserting that the average consumer has "high-risk" CRP

levels and that the Products are proven to take them from this "high-risk" range to a "low-risk"

range. This representation is false and misleading.

50.     Dr. Paul M. Ridker, MD, MPH, the Eugene Braunwald Professor of Medicine at

Harvard Medical School and director of the Center for Cardiovascular Disease Prevention at

Brigham and Women's Hospital, states that the "high-risk" range of CRP levels is actually at 3.0

mg/L and above.  Dr. Ridker concludes that "[a]pproximately 25% of the US population has

levels of CRP greater than 3 mg/L, the cut point for high risk."  The following chart represents

an accurate CRP level risk chart: [8]

---

[8] Paul M. Ridker, C-Reactive Protein: *A Simple Test to Help Predict Risk of Heart Attack and Stroke, Journal of the American Heart Association* (2003).



51.     Accordingly, Defendants representations concerning CRP levels are false and misleading, as the study, even with all its major flaws, did not show that even one participant's CPR levels were lowered from greater than 3.0 mg/L ("high risk") to less than 1.0 mg/L ("low risk").

52.     The dishonesty of Defendants' claims concerning CRP levels is further illustrated by another one of Defendants' studies (the "Verve Study"), which was never published.  The Verve Study is essentially identical in every way as the Immune Function Study, except that the Verve Study tested the Verve Product instead of Mangosteen Plus with Essential Minerals Product, which was tested in the Immune Function Study.  Defendants offer the following chart summarizing the results of the Verve study:



53.     The results of the Verve Study show that even before consuming the Products, the participants in the experimental group reported CRP levels of nearly 3 mg/L, representing a nearly 100% increase over participants in the Immune Function Study.  Such a discrepancy can only be attributed to unacceptably small sample sizes of both studies, and demonstrates that any results based on these studies are not "proof" of Defendants' claims and that Defendants' representations concerning the Immune Function Study are false and misleading.

54.     Defendants also advertise that all of the Products (including both the Verve and Mangosteen Plus Products) contain an identical, "clinically proven" formula which has been proven to reduce C-reactive protein levels from "high risk range" to "low risk range."  However, the Verve Study clearly shows that this "clinically proven" formula only lowered CRP levels to roughly 2.3 mg/L, which is about 130% higher than the "low-risk" range of CRP levels.  As a result, Defendants have knowingly and purposefully misled and lied to consumers about the efficacy of the Products and their capacity to lower CRP levels.

55.     The Immune Function Study is also flawed because the researchers performed analyses on the data using standard software only after hand-selecting "abnormal values" from the data pool.  This process suggests a rigged analysis and, because the population size was so small, further exacerbates the population-size problem by ever shrinking the available data.

### 2.     The Bioavailability Study

56.     Defendants assert that the Bioavailability Study "was designed to determine the overall bioavailability (body readiness) and antioxidant effect of the Vemma formula in the body."  Defendants claim that this study proves that the Products "Increase[] ORAC blood levels for 6 hours after intake," "Increase[] vitamins and antioxidants in the blood," cause "superior antioxidant absorption," and are "highly bioavailable."  Again, Defendants represent

that the Bioavailability Study was done according to the "HIGHEST STANDARD OF CLINICAL RESEARCH."

57.    However, the Bioavailability Study does not "prove" any of Defendants' claims and is highly misleading, because it is fundamentally flawed and is contradicted by established research.  As a result, Defendants have knowingly and intentionally misled consumers about the efficacy and bioavailability of the Products.

58.    The Bioavailability Study's most fundamental flaw is its population size.  The study was purportedly placebo controlled, meaning that participants were divided between two study groups – those who consumed the Product and those who did not.  However, with a total population pool of twenty (20) participants, consisting of ten (10) men and ten (10) women), the actual number of participants that took the Product was no more than ten (10), far too little to make any generalizations about the Products or offer "proof" of any of Defendants' claims.

59.    Defendants' claims concerning the Products based on the Bioavailability Study, such as that they are "highly bioavailable", are highly misleading and false because the study showed that the Products may in fact have absolutely no effect on the human body.  The study clearly states that "a complete data set was not available for several subjects due to concentrations being below LLOQ."[9]  Thus, although Defendants make their representations about the Products without qualification, the Bioavailability Study showed, if anything at all, that out of ten participants who actually consumed the Products, several participants did not show any results that could even be detected in a laboratory setting.  In other words, the Products were not at all bioavailable and left absolutely no mark that could be detected.

---

[9] LLOQ stands for Lower Limit of Quantification.

### 3.     Defendants' Misleading Advertising Concerning ORAC Values

60.     Defendants tout the Products' Oxygen Radical Absorbance Capacity (ORAC) value as part of the overall misleading marketing campaign concerning the Products' effectiveness and bioavailability (capacity to be absorbed by the human body).  Defendants assert that the ORAC value is "the measurement of an antioxidant's power to neutralize free radicals…The higher the ORAC value, the stronger the compound's capacity and the greater its ability to prevent free-radical damage at the cellular level.  Vemma boasts superior antioxidant protection of over 4,800 ORAC units per serving."

61.     However, Defendants' representations concerning ORAC values and the Products' bioavailability are demonstrably false and misleading, as the United States Department of Agriculture ("USDA") has determined that ORAC values "have **no relevance** to the effects of specific bioactive compounds, including polyphenols on human health" (emphasis added).[10]  The USDA explained:

> There are a number of bioactive compounds which are theorized to have a role in preventing or ameliorating various chronic diseases such as cancer, coronary vascular disease, Alzheimer's, and diabetes.  However, the associated metabolic pathways are not completely understood and non-antioxidant mechanisms, still undefined, may be responsible. **ORAC values are routinely misused by food and dietary supplement manufacturing companies to promote their products and by consumers to guide their food and dietary supplement choices.**

> A number of chemical techniques, of which Oxygen Radical Absorbance Capacity (ORAC) is, one, were developed in an attempt to measure the antioxidant capacity of foods. The ORAC assay measures the degree of inhibition of peroxy-radical-induced oxidation by the compounds of interest in a chemical milieu. It measures the value as Trolox equivalents and includes both inhibition time and the extent of inhibition of oxidation.  Some newer versions of the ORAC assay use other substrates and results among the various ORAC assays are not comparable. In addition to the ORAC assay, other measures of antioxidant capacity include ferric ion reducing antioxidant power (FRAP) and trolox equivalence antioxidant capacity (TEAC) assays. These assays are

---

[10] United States Department of Agriculture, *Oxygen Radical Absorbance Capacity (ORAC) of Selected Foods*, Release 2 (2010), http://www.ars.usda.gov/services/docs.htm?docid=15866 (last accessed Sept. 22, 2014).

based on discrete underlying mechanisms that use different radical or oxidant sources and therefore generate distinct values and cannot be compared directly.

**There is no evidence that the beneficial effects of polyphenol-rich foods can be attributed to the antioxidant properties of these foods.  The data for antioxidant capacity of foods generated by in vitro (test-tube) methods cannot be extrapolated to in vivo (human) effects and the clinical trials to test benefits of dietary antioxidants have produced mixed results.** We know now that antioxidant molecules in food have a wide range of functions, many of which are unrelated to the ability to absorb free radicals.

(emphasis added)

62.     Further, Defendants' advertising suggesting that ORAC values have anything to do with bioavailability is inherently misleading and is precisely why the USDA removed an "ORAC database" from its website.  Dr. Jeffrey B. Blumberg, PhD, a professor and director of the Antioxidants Research Laboratory at Tufts University, explained that "One of the reasons the USDA removed the ORAC database from its website was it felt that some companies were abusing this resource by suggesting that it supported the purported content and health claims about their products…But the ORAC is an in vitro assay and one of several related methods that, **by definition, does not account for bioavailability, distribution, and metabolism of a product's ingredients**.  Further, correlations between ORAC results and clinical outcomes are lacking…A high ORAC value of a food, beverage, or supplement as an indicator of health benefits is misleading."

63.     Defendants also advertise that the purported high ORAC value of their Products is the result of the main "active" ingredient, Mangosteen.  However, Defendants' own study, the Bioavailability Study, shows that neither Mangosteen, nor any of Defendants' other key advertised ingredients, such as Vitamins C and E, and green tea catechins, contribute in any significant way to the Products' ORAC value.  The study's authors stated that "we can conclude that α-mangostin is not the main contributor to the increase in plasma ORAC…Although one

24

serving (59 mL) of the Vemma formula contains 300 mg of vitamins C and 60 IU of vitamin E, more than double the recommended daily values, they would not be main contributors to the increase in ORAC value in this study…We did not detect any green tea catechins in the plasma samples…Therefore, we can conclude that green tea catechins do not make a major contribution…."

64.     Accordingly, Defendants' advertising concerning the Products' bioavailability, ORAC value, and "Antioxidant (ORAC) Capacity After Vemma" is false and misleading. Further, Defendants' advertising suggesting that the Products are superior on the basis that they have high ORAC values is false and misleading because ORAC values have "no relevance" to human health.  Defendants' representations concerning ORAC values and bioavailability are also false and misleading because the Bioavailability Study is unsound, misleading, and does not prove their claims.

### 4.     Published Research Directly Refutes Defendants' Claims That Clinical Data Shows the Efficacy of Mangosteen Supplements In Humans

65.     In a published article reviewing the effectiveness of Garcinia mangostana ("Mangosteen") for human use, researchers concluded that "**there are no clinical data available that would provide evidence of efficacy of mangosteen xanthones or extracts in humans**…[M]aking unsubstantiated therapeutic claims will result in consumer expectations which cannot be met"[11] (emphasis added).  The authors warned that "the marketing hype about mangosteen reached levels of dishonest advertisement and misleading claims about the products" because manufacturers were using claims such as "proven benefits of xanthones – you can feel the difference" to sell their products.

---

[11] Dmitriy Obolskiy et al., *Garcinia mangostana L.: A Phytochemical and Pharmacological Review*, Phytother. Res. 23, 1047-1065 (2009).

66.     The authors concluded that "any manufacturer of mangosteen extracts which makes such claims, labels and promotes its products for use in the treatment and prevention of different clinical conditions (such as improvement of digestive system, immunomodulator activity, curing of cartilage and joint diseases, neutralization of toxins) will run the risk that the products intended for such uses are considered drugs according to current regulations.  Approval of new drugs is based on scientific data which demonstrates their safety and efficiency. Consequentially, manufacturers need to provide scientific data to support the health claims."

67.     More recently, Dr. Celeste Robb-Nicholson, M.D., Editor in Chief of *Harvard Women's Health Watch*, published an article in a Q&A format concerning mangosteen supplements.  In a section titled "Does mangosteen have any health benefits?,"  Dr. Nicholson observed:

> In the marketplace, mangosteen is promoted as a way to improve the balance of bacteria in the body, boost the immune system, and relieve conditions such as diarrhea, urinary infections, tuberculosis, eczema, and menstrual disorders.  These purported health benefits are **unproven in humans**.
>
> The compilers of the Natural Medicines Comprehensive Database – an exhaustive compendium of evidence-based information on alternative treatments – have determined that there's **not enough evidence to support the use of mangosteen for treating infections or inflammation or for inhibiting cancer cell growth**.[12]

(emphasis added).

68.     Defendants' two privately funded studies are unsound and fit the general mold for deceptive advertising in the mangosteen supplement industry.  A published review of mangosteen supplement advertising using "science" and shoddy "clinical studies" to support claims of effectiveness illustrates that Defendants' marketing "may pose a public health threat by misleading consumers into assuming that product safety and effectiveness are backed by rigorous

---

[12] Celeste Robb-Nicholson, *Ask the Doctor.  Does Mangosteen Have Any Health Benefits?*, Harv. Womens Health Watch, May 1, 2012.

scientific data."[13]  The author of the published review provides an overview of how

manufacturers such as Defendants use purported "clinical studies" to mislead consumers about

the effectiveness and safety of mangosteen supplements like the Products:

> Nutraceutical juice beverages containing tropical botanicals such as acai, noni, and mangosteen are a fast growing portion of the $23 billion "functional and natural ready-to-drink beverage" market.  While they look like everyday beverages in packaging and appearance, these so-called "super food: beverages may also be classified and promoted as liquid dietary supplements.  Some of their botanical ingredients may also contain potent pharmacoactive ingredients.  Xanthone derivatives from mangosteen (garcinia mangostana), for example, have been investigated in-vitro for their potential antifungal, antibacterial, and cytotoxic effect.  **Reliable evidence that such beverages are safe or promote health when consumed frequently by humans, however, is currently lacking.**
>
> The larger field of nutrition research has been criticized for over-emphasizing health claims that are based on methodologically weak research and pseudoscience, and the dietary supplement sector appears to follow this practice also.  Nutraceutical juice beverages are widely marketed across all media as "super foods," with the Internet providing a convenient venue for sophisticated multimedia marketing presentations and easy product purchase. Central to the marketing of many products is the citation of "scientific studies" supporting the product's health claims.  **While these studies seem deliberately created for marketing purposes, their findings and quality are generally presented in a manner that appears designed to mislead potential consumers.**  This practice of **using manufacturer funded, methodologically weak studies characterized by short duration and small sample size** has been previously identified among dietary weight loss supplements, a closely related class of products.
>
> ….
>
> Mangosteen fruit juice is made from the fruit of the *Garcinia mangostana* plant, found in tropical climates of South East Asia.  **The beverage is widely marketed for potent yet unproven health benefits attributed to its high antioxidant content.  These include claims, generally theoretical in nature and unsubstantiated by rigorous human trials, that the product ingredients: protects against free radicals, increase energy and stamina, support the immune system, promote a healthy digestive system, assist in recovery after exercise, and support joint and cartilage functionality**…
>
> ….
>
> Using methodologically weak studies, sometimes containing undeclared conflicts of interest, to validate dietary supplement use is nothing new.  That it may be done with a new class of liquid dietary supplements containing potentially potent pharmacological agents, whose outward appearance as fruit juice may inspire frequent consumption by consumers, is, however, a new and worrisome trend.  In the interests of consumer safety and fair marketing, several stakeholders share a role in mitigating potential adverse

---

[13] Ano L. Lobb, *Science in Liquid Dietary Supplement Promotion: The Misleading Case of Mangosteen Juice*, Hawaii J. Med. Public Health, Feb. 2012, at 46-48.

effects.  Manufacturers should abide by ethical marketing practices that do not
misrepresent or overstate research findings or presumed safety of their products. This
includes full disclosure of the size, duration, funding, and quality of research pertinent to
claims supporting their products…

.…
Liquid dietary supplements that are essentially fruit juices containing novel
botanical ingredients may also contain pharmacologically active constituents.  Though
the true nature of health benefit and safety of these products has not generally been
established in humans, some are widely implied as being of benefit, which is
substantiated by "science."  Limited, low quality research in the form of manufacturer-
funded studies characterized by short duration and small sample size is frequently used to
bolster marketing claims and allay fears of potential risks, and may amount to a
misleading use of science.  If this trend extends to other related products that are similarly
widely consumed, it may pose a burgeoning public health threat by misleading
consumers.

(Citations Omitted).

69.     Some of Defendants' specific claims concerning its Products have also been

directly refuted by published research.  For example, in a published article titled *What Are the*

*Facts and Myths about Mangosteen?*. the author examined health claims made by mangosteen

dietary supplement manufacturers, including that the supplements "provide[] antioxidant

protection against free radicals," "maintain[] immune system health," and "provide[] positive

mental support."[14]  The author observed that "Marketers cite long lists of lab studies as 'proof'

of mangosteen's health benefits.  But there are no clinical trials, and what happens in a test tube

or animal may not occur in a human.  Any reported benefits in humans have been anecdotal.  No

one even knows if the processed fruit juice and capsules retain the potentially beneficial

compounds."  The author recommended that "Until the health benefits of mangosteen are

scientifically proven, it is cheaper and wiser to get antioxidants from fruit and vegetable

sources."

---

[14] Wendy Marcason, *What Are the Facts and Myths about Mangosteen?*, J. Am. Diet Assoc.,
June 2006, at 986.

C.    **Defendants' Unlawful Health Claim Marketing**

70.    Federal and State law and an active Federal Trade Commission ("FTC") injunction bar Defendants from claiming that the Products diagnose, mitigate, treat, cure, or prevent a specific disease or class of diseases.  Further, the FTC injunction bars Defendants from misleading use of testimonials, such as those suggesting that the Products diagnose, mitigate, treat, cure, or prevent diseases or that experiences expressed in testimonials are typical.  Having been caught red handed before, Defendants are again making millions through precisely these types of marketing schemes.

71.    Boreyko established Vemma Nutrition Company for an illegal purpose: to perpetrate fraud.  The Products are Boreyko's and the Company's second group of supplements to utilize misleading marketing practices, testimonials, and illegal health claims as a means of promoting a product with ingredients that do not perform as claimed.  Boreyko and his Company have honed their marketing tactics over time, drawing upon their prior experience of using similarly deceptive marketing tactics in earlier products, such as using misleading testimonials and claiming that the products' contained magical ingredients that could cure diseases.  Boreyko and Vemma Nutrition Company then employed this entire arsenal of false marketing and advertising tricks to sell the Products, their most successful brand of supplements yet.

72.    Defendants abused the corporate form to accomplish fraudulent objects, namely, to fraudulently promote the sale of their Products, to conceal the proceeds of those frauds and frustrate the ability of victims to obtain redress for the fraud.

73.    In 1999, the FTC issued an injunction against Boreyko and New Vision International (Vemma Nutrition Company's predecessor) barring them from selling a group of three products called God's Recipe using unsubstantiated health claims and testimonials suggesting that the products treated, mitigated, or cured any diseases and using testimonials

without disclaimers saying that such experiences were not typical.  The FTC Injunction

prohibited Boreyko and New Vision International from unlawfully marketing God's Recipe as a

treatment for Attention Deficit Disorder ("ADD") and Attention Deficit Hyperactivity Disorder

("ADHD") and as an effective alternative treatment to the prescription drug Ritalin.

74.     The three products composing God's Recipe were "PC Grape Seed Extract with

an Herbal Blend" (a mineral tonic drink), "Essential Minerals" (an antioxidant capsule), and

"Multi-Enzymes with Alfalfa/Barley Sprouts" (a Multi-enzyme tablet), which were in fact no

more than common supplements that could be found in a typical health food store.

75.     Jodie Bernstein, Director of the FTC's Bureau of Consumer Protection explained

that Boreyko and New Vision International used "ads [that] exploited parents' fears of

prescription drugs like Ritalin by making claims that God's Recipe was a natural, safer

alternative for treating ADD and ADHD…New Vision lacked the substantiation the Commission

requires for that claim.  Companies or individuals who make health-benefit claims for dietary

supplements or other products must substantiate those claims under Commission law."

76.     The FTC Injunction further ordered Boreyko and New Vision International:

[D]irectly or through any corporation, subsidiary, division, or other device, in connection
with the manufacturing, labeling, advertising promotion, offering for sale, sale, or
distribution of any product in or affecting commerce, **shall not represent**, in any manner,
expressly or by implication, that the **experience represented by any user testimonial or
endorsement of the product represents the typical or ordinary experience of
member of the public who use the product**, unless:
       A.  At the time the representation is made, respondents possess and rely upon
competent and reliable evidence, which when appropriate must be competent and reliable
scientific evidence, that substantiates the representation; or
       B.  Respondents disclose, clearly and prominently, and in close proximity to the
endorsement or testimonial, either:
              1.  what the generally expected results would be for users of the product,
or
              2.  the limited applicability of the endorser's experience to what
consumers may generally expect to achieve, that is, that consumers should not
expect to experience similar results.

….

…[D]irectly or through any corporation, partnership, subsidiary, division, or other device, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any food, drug or dietary supplement, in or affecting commerce, **shall not make any representation**, in any manner, expressly or by implication, regarding:

    A.  The safety of such product; or

    B.  The **ability of such product to treat, cure, alleviate the symptoms of, prevent, or reduce the risk of developing any disease or disorder**, unless, at the time the representation is made, respondents possess and rely upon competent and reliable scientific evidence that substantiates the representation.

….

IT IS FURTHER ORDERED that respondents New Vision International, Inc., and NVI Promotions, L.L.C., and their successors and assigns, shall:

    A.  **Institute a reasonable program of continuing surveillance adequate to reveal whether the representations of each of respondents' independent distributors conform to the requirements of this order.  Such program must include, at a minimum, the following:**

        1.  **A requirement that all independent distributors submit advertising to respondents for pre-approval**;

        2.  A mechanism for suspending or terminating business dealings with any independent distributor who fails to submit advertising for pre-approval;

        3.  A reminder once every six months of the requirement that all advertising must be submitted for pre-approval.  Such reminder shall be delivered to each independent distributor who will receive compensation from respondents any time during the month immediately following the date of service of this order, and once during each sixth month thereafter.  Such reminder may be inserted into envelopes containing compensation checks, product shipments or company mailings; and

        4.  **A monthly search of the World Wide Web for independent distributor advertising.**  Such a search shall use a commercial search engine, and include the search terms "New Vision" and the brand names of each of respondents' products.

    B.  Promptly investigate any complaint about any independent distributor and maintain records of any such complaint, investigation and disposition of the complaint for five (5) years from the date of the complaint, such records to be furnished to the Commission upon request.

    C.  Discontinue dealing with any independent distributor once respondents have actual knowledge, or knowledge fairly implied on the basis of objective circumstances, that such distributor is making a representation prohibited by any part of this order, unless, upon notification by respondents, such distributor immediately ceases making any such representation.  If respondents obtain actual knowledge, or knowledge fairly implied on the

> basis of objective circumstances, that such distributor has not permanently
> ceased making any representation prohibited by any part of this order ,
> respondents must immediately discontinue dealing with such distributor.
>
> ….
>
> **This order will terminate on March 3, 2019**, or twenty (20) years from the most recent
> date that the United States or the Federal Trade Commission files a complaint (with or
> without an accompanying consent decree) in federal court alleging any violation of the
> order, whichever comes later…

(emphasis added)

77.    After the FTC issued the injunction, all of New Vision International's business
was merged with Vemma Nutrition Company.  In a message to all New Vision International
distributors and sales representatives, Boreyko stated, "[a]fter careful consideration, we've
decided to transfer New Vision business operations to our sister Company, Vemma Nutrition
Company."  All New Vision International distributors and salespersons thus immediately became
distributors for Vemma Nutrition Company.  Boreyko told New Vision International's
distributors and salespersons that "[a] comparable and favorable spot has been selected for you
within the Vemma organization.  Access your Vemma Back Office with your current New
Vision login and password to see all of the exciting changes!"

78.    Vemma Nutrition Company is the direct successor and assign of New Vision
International and, therefore, the FTC Injunction applies with equal force to Vemma Nutrition
Company.  Vemma Nutrition Company and Boreyko are knowingly and purposefully violating
the FTC Injunction.

### 1.    Defendants Are Vicariously Liable For The Acts Of Their Distributors

79.    The "multi-level marketing" sales structure through which the Products are sold is
essential to the success of Defendants' fraud.  Defendants have elaborately set up a network of
what they term "independent" distributors, who are held out to be independent businesses from
Defendants.  The vast majority of Defendants' distributors are people with no training in

medicine or the science of nutrition, nor is any training required or provided by Defendants

before or after persons become distributors.  Defendants' distributors not only make money from

selling the Products, but also by convincing more individuals to become distributors of the

Products.  Defendants' attempt to distance themselves from the distributors is a calculated

scheme to insulate themselves from liability created by the ridiculous health claims Defendants

train their distributors to make.  The simple truth is, however, that Defendants have raked in

hundreds of millions from the sales of distributor advertising using outrageous health claims.

80.     As shown below, any attempts by Defendants to "instruct" and "forbid" their

distributors from making outlandish health claims are clearly an artifice to insulate Defendants

from liability.  Defendants have for years known of, encouraged, aided, and profited from their

distributors' unlawful health claims.

81.     The FTC Injunction requires that Defendants pre-approve all of their distributors'

marketing and conduct a monthly internet check to ensure that distributors' marketing complies

with federal law and the injunction.  Further, Vemma Nutrition Company instructs all of its

distributors to submit their marketing materials to Defendants for pre-approval.  As evidenced by

the routine, pervasive, systematic, and widespread use of marketing touting illegal health claims

online and in person, and through Defendants' encouragement, aiding, control and oversight of

such practices, Defendants are in direct violation of the FTC Injunction and Federal and State

laws which prohibit marketing the Products using illegal health claims.

82.     Due to Defendants' expansive and systematic control and oversight of the specific

details, practices, and methods of the distributors' every day activities, Defendants' distributors

are in fact employees and Defendants' agents.  Defendants control almost every aspect of their

distributors' marketing practices and encourage their employees to incorporate Vemma Nutrition

Company's corporate logos and signs as their own.  Defendants even instruct their distributors to attract new customers through Defendants' customized website, which is provided to all new distributors, and through Defendants' mobile app.  The website and mobile app prominently display Vemma Nutrition Company's corporate logos, signs, and markings and encourage consumers and viewers to perceive the distributors as Defendants' employees.  Defendants' "distributors" are no different than typical sales employees that get paid based on commission. Defendants are therefore liable for the illegal marketing practices of their distributors.

83.     Defendants' recruiting materials, such as the "Vemma Flipbook," make clear that Defendants' distributors are in fact no different than commission-based sales persons. Defendants' recruiting materials make this concept exceptionally clear:



84.     On the bottom of the same page, Defendants clarify that "customers find the company through you the affiliate. (Commissions paid on product sales only)."

85.    Defendants' recruiting materials promise potential distributors that they "Never worry about significant investment, research & development, manufacturing, product sourcing, shipping/inventory, cash flow/accounting, payroll/overhead, health care/workers' comp, legal/liabilities, branding marketing materials, unions/government restrictions," and further describes distributors' relationship with Defendants as one of a "partnership."



86.    Defendants accordingly promise potential distributors that they never have to worry about government restrictions and legal liabilities and yet have purposefully implemented a fraudulent marketing structure for the very purpose of escaping liability for the actions of its distributors.

87.    Vemma Nutrition Company's contract with its distributors states that Defendants provide all of their distributors with pre-made websites and apps which distributors may tailor for the express purpose of advertising the Products on these platforms.  The contract states that

"Vemma provides you with an Affiliate website, Vemma smart phone Apps, and buttons, banners, and online content, to advertise your business."

88.     The distributor contract affirms that Defendants pre-approve all distributor advertising not provided by Defendants themselves, all distributor advertising on social media, and all distributor advertising on the internet generally.  Further, the distributor contract encourages the use of testimonials and states that Defendants pre-approve the use of all testimonials.

89.     The Vemma Action Plan, a document provided to all new Vemma Nutrition Company distributors, states the following, and includes the image directly below:

> Another perk about running your Vemma business is the FREE marketing website you receive to help share Vemma virtually with everyone you meet.  Your Vemma website is mobile compatible, features video and social media, and enables you to have your own blog to help tell your Why like never before.
>
> Having your own website is imperative when you're in business.  Refer your contacts to your Vemma website so they can learn more about Vemma products and the opportunity.  You don't need to be a webmaster to set it up or update it; we've provided various template options and an array of rotating banner ads for you to choose from.
> ….
> What better way to introduce yourself and what Vemma means to you than with your very own Vemma Profile page.  More and more, people are in tune with networking via social media.  With your own profile, connecting and sharing your Vemma story is fun and most importantly, personal!
>
> We set you up with a ready-made template, but the real magic happens when you make the Vemma Profile "yours."  Decide which photos you want to use.  What do you want people to know about you and why Vemma is part of your life?  After all, people enjoy doing business with people they know, have things in common with and trust.
>
> Begin customizing your Vemma Profile template by visiting your Back Office.



90. The Vemma Action Plan goes on to state :

> "Vemma has created a variety of effective business tools to help you present the Vemma products and opportunity.  These tools help you build professional confidence by 'doing the heavy lifting,' so to speak!  Some of our most popular business tools are:
> - Product Fact Sheets
> - Driving Force DVD
> - Vemma Product Catalog
> - Clinical Studies
> - Vemma Brand Safety Manual
> - Vemma Scientific Resource Guide
> - Verve Brand Brochure

**2.      Defendants Instruct Distributors To Sell The Products Using Unlawful Health Claims**

91.      "Hundreds of thousands of Vemma affiliates have been trained to sell the beverage business and its products using unsubstantiated health claims in violation of an FTC order that Vemma CEO B.K. Boreyko entered into in 1999."[15]

---

[15] https://www.truthinadvertising.org/vemma-affiliates-health-claims-violate-ftc-order/

92.     Defendants' conspire with their top-earning affiliates to train their "downlines" – distributors on the lower levels of Defendants' multi-level marketing scheme – "to use stories that claim Vemma can cure several diseases, treat dozens of medical ailments, and alleviate the symptoms of multiple maladies."[16]

93.     For example, Tom and Bethany Alkazin are by far Defendants' top-earning distributors, having made over $17 million through their association with Defendants.  In fact, the Alkazins account for roughly forty (40) percent of Defendants' total sales volume, as they control more than 200,000 of Defendants' distributors through their downline.  The Alkazins are uniformly endorsed by Defendants online, through speaking engagements, and in widespread advertising as the pinnacle of Defendants' business and are promoted as examples and model figures that all Defendants' distributors should emulate.

94.     The Alkazins have known Defendant Boreyko for decades and were also some of the top earners of New Vision International.

95.     On Defendants' website, Defendants have a page titled "Vemma Elite: Our Highest Achievers," and includes pictures of all of Defendants' top distributors by order of rank, with Tom and Bethany Alkazin as the highest ranked.  In fact, Tom and Bethany Alkazin have a distributor "rank" that no other distributor holds, the "Star Pinnacle."  Just above the list of Defendants' model distributors, Defendants' website states:

> Vemma is proud to present our Elite Affiliates.
>
>      Who are they, you ask? They are the visionaries, the ones who teach others to think bigger and dream larger than ever imaginable.  They see endless possibilities and opportunities.  They are the ones who inspire and want to change lives; they are the bold and brave.
>      The path of a dreamer is never easy; if it were, everyone would do it.  Entrepreneurial leadership at this level requires tenacity resilience and determination.  Vemma Elite are teachers of goal setting, and business and financial skills; moreover,

---

[16] *Id.*

they are messengers of hope. The Vemma Elite are comprised of the cream of the crop, the select few who through years of hard work and dedication have obtained an extraordinary level of achievement. Through their accomplishments and entrepreneurial spirit, they inspire waves of new Vemma Affiliates to embark on this wellness revolution with us.

96. The Alkazins, with direct endorsement, aid, support, encouragement, control, and in conspiracy with Defendants, published a 40-page workbook (the "Distributor Manual") complete with a CD titled "Roadmap to Success," which describes their "8 step system for building a long lasting VEMMA Business!" The Distributor Manual was first published in 2007, a second edition was published in 2009, a third edition was published in 2011, and another edition was published in March 2014. The Distributor Manual represents the training manual of thousands of Defendants' distributors.

97. The Distributor Manual was incorporated by Defendants almost word for word as the official training book for all Vemma distributors. Defendants have published a Vemma Affiliate Action Plan: 8 Steps To Your Success, which incorporates each of the 8 steps from the Distributor Manual and has identical instructions and scripts for distributors to follow. The Vemma Affiliate Action Plan is signed by Defendant Boreyko and has official Vemma insignia and logos on the document.

98. On the first page of the Distributor Manual,[17] the instructions state:

> Success in **Vemma** is not a mystery. The **Roadmap to Success** removes all mystery and doubt because these principles are a proven pathway to success. The **Roadmap to Success** is the EXACT roadmap that helped us make our dreams and goals a reality. This proven plan for success is simple and something you can do. This proven plan of action is built on a few simple fundamentals that, when repeated over and over, create momentum and can lead you to the success and results you are seeking. Your job is to learn these principles and fundamentals and put them into action consistently.

---

[17] Though slight wording variations exist between the four editions of the Distributor Manual and the Vemma Affiliate Action Plan, the material is almost identical. This complaint will refer to all four editions of the Distributor Manual and the Vemma Affiliate Action Plan as the "Distributor Manual."

Please do not try to reinvent the wheel.  The plan works; it is your responsibility to work the plan!

It has been said that *success comes from doing the correct things, correctly, long enough*.  Well, we are going to teach you how to do the correct things; correctly … the "*long enough*" part of this success formula is up to you.  In other words, once you learn how to do the correct things, correctly; your success is dependent upon your PERSISTENCE.  You must stay consistent and stay the course.  Do not allow yourself to get off track or deviate from this proven plan.

As you learn these principles and fundamentals, you will begin to make progress when you consistently apply them.  Then, as you begin to assemble a winning team, you will need to teach others these same principles and fundamentals.  Teach and train your team that as soon as they enroll a new Brand Partner that wants to build a business, they must hand them the **Roadmap to Success** training book so they too can learn what to do and how to do it.  It is all about duplication so remember these three words; LEARN, APPLY, and TEACH.

….

We recognize that everyone who enters our business has different levels of time, energy, self-confidence, desire, and talent.  That is why we created this program to be adaptable to every Brand Partner.  You can go at your own pace and build your **Vemma** business as big as you can dream.

Finally, we suggest that you review the **Roadmap to Success** audio CD and workbook several times.  Each time you listen to the CD or review a step, you will pick up something new.  We also encourage you to review the CD and workbook every 60-90 days to stay plugged into the key principles and fundamentals that will lead you to success.

(emphasis in original).

99.     The Distributor Manual's initial instruction is for the distributor to create as large a list of personal contacts as possible, including everyone ranging from the distributor's closest friends and relatives and branching out to the persons on the fringes of the distributor's social network, such as doctors, barbers, neighbors, and day care providers.  The Distributor Manual then instructs:

As you created your list, we coached you NOT to pre-judge.  Now we do want you to PRIORITIZE who you contact first.

From the initial Contact List that you created, prioritize the **Top 20 people that are having a health challenge**

(emphasis in original).

100.    Thus, Defendants' Distributor Manual makes pristinely clear that distributors are to specifically target customers with health challenges.

101.    Next, the Distributor Manual describes the essential tools that every distributor must have and use to market and advertise the Products.  The Distributor Manual instructs:

> **WHAT YOU NEED TO HAVE!**
> We want you to become tremendously successful! You must make the commitment to have the tools necessary to succeed:
> - **Vemma** and **Verve** products – to grow quickly, be certain you have a Gold, Silver, or Bronze Builder Package available.
> - Tools – you need tools for credibility and duplication!  Go to www.vemmasuccesstools.com and www.vmatools.com
> - Clinical Studies
> - Stories – The results people are enjoying are remarkable, go to www.vmastories.com

(emphasis in original).

102.    The website www.vmastories.com, the website cited in the Distributor Manual as a necessary tool "for credibility and duplication" contains testimonial after testimonial organized by headings such as "Cholesterol," "Lower blood pressure," "Cure Crohn's disease," "Control diabetes," "Alleviate the symptoms of MS," "Eliminate all pain from arthritis, fibromyalgia and peripheral neuropathy," "Stop heart palpitations caused by a mitral valve problem," "Treat autism and ADD," and "Prevent the common cold and help with flu symptoms."  Testimonials on the website further attest that individuals used the Products to eliminate psoriasis, remove plantar wart, and even to save a dying dog.

103.    For example, under the heading titled "Cholesterol," the website lists the following testimonial:



**Welcome to VMAStories.com!**

**Cholesterol**

"My cholesterol had dropped 70 points. I did not exercise. I did not change my diet. I know it was the minerals and mangosteen. I'm really excited about it and I'll be taking it for the rest of my life!"

*Joan* - Florida

104.     Another testimonial, from "Mary" from Indiana, states:

Mary: "I was taking the following medications: Fosamax for osteoporosis in my legs-1 pill a week Methrexate 5mg. - 4 pills at once, one time a week. Folic Acid - 1 pill every day for arthritis. None of this was helping me, until I started taking the minerals and mangosteen. I have quit all of the medicines, except for the Fosamax. I initially started taking Vemma in my orange juice once a day and in two weeks, I could see a lot of difference in the way I felt. All of my pain was just about gone. Every day I started feeling better and I now I am not in any pain at all. My hands were so bad I would close my hands and my fingers would close and lock, I would have to take each hand & pull my fingers open, and they had so much pain I wanted to cry. But now I have taken most of the 4 bottles of the minerals and mangosteen for two months and I am feeling great, no pain at all. Believe me, I know what pain is and I had enough of it, and I am so happy to be pain free so far. I will always take it."

105.     Another testimonial, from "Rachel E." states:

I thank you and Dr. Yibing Wong for the miracle of Mangosteen and minerals…and I now have a testimony. My son's eczema has also improved, although I do struggle with getting him to take it for me on a daily basis, so I am working on being creative. I pray that I will be able to take this product for the rest of my life, and share it with all that I know, in hopes that others will benefit in whatever ways they are searching, hoping and praying for. I just wanted to thank you for saving and changing my life.

106.     Many of the testimonials attest that the individuals stopped taking prescription

drugs for diagnosed diseases and instead switched to the Products, which, supposedly helped or

cured those diseases.

107.     Defendants' top distributors, such as Brad Alkazin, Grady Polcyn, Alex Morton, Linda Proctor, and Dave Rasmussen, who are listed and promoted by Defendants on the "Vemma Elite: Our Highest Achievers" page, routinely provide links to www.vmastories.com on their Vemma web pages and through online marketing of the Products as a great source of testimonials for customers to see.

108.     Defendants also promote www.vmastories.com through dozens of "tweets" on the social media platform Twitter.  The following "tweet" is typical:



109.     The Distributor Manual then goes on to list phrases, conversations, and prompts what distributors "NEED TO SAY!" in order to sell the Products.  The Distributor Manual states:

Vemma Approach

"*Mary, is your health important to you?*" Or another way of saying this is "*Mary, on a scale of 1 to 10, how important is your health?*"

(Be quiet and listen!)

OR, if you know of a health challenge she is having say, "*If there was a natural way to help you with the symptoms of what you are dealing with, what would you say?*" (Be quiet and listen!)

"*The reason that I am asking is that I am curious – what are you doing to avoid and prevent disease?*"  If you are talking to a younger person, say "*What are you doing to reduce stress and increase energy?*"

(Be quiet and listen!)

"*Specifically, what are you doing to supplement you diet?*"

(Be quiet and listen!)

"*I have to tell you about an 'amazing nutritional discovery' called* **Vemma**!"

Most will ask: "What's **Vemma**?"

"*The most complete liquid nutrition program that you can find anywhere – you will not believe how GREAT this taste – you have to taste it!*"

(emphasis in original).

110.     The Distributor Manual goes on to provide "another tremendously successful

dialogue that you can use:"

> **Ask them what they are doing to avoid and prevent disease, or to reduce stress and increase energy.**
>      A.  If they tell you they are taking *pills, tablets, or capsules*, let them know that until now those delivery systems were the best, but now there is **Vemma! "The most complete liquid nutritional program that you can find anywhere."**

(emphasis in original).

111.     Defendants' second-highest earning distributors, Ruth and Jeff Elliot, next in line

to the Alkazins, control a downline of over 200,000 distributors "with estimated earning

exceeding $7.8 million since 2006 and combined sales revenue over $180 million."  The Elliots

were recruited to participate in Defendants' fraudulent scheme directly by Defendant Boreyko.

112.     Ruth Elliot counsels her thousands of distributors to market the Products exactly

the same way as she has in her inspirational "rags to riches" story.  Ruth Elliot's open secret

behind her success is that she uses her own family story to sell the Products.  Ruth Elliot's family

story is that supposedly the Products helped her children overcome and alleviate the symptoms

of "catastrophic illnesses" and helped her husband, Jeff Elliot to completely stop taking his prescription medication for issues with his prostate.  Ruth Elliot instructs distributors to use similar health claims in order to market the Products as capable of curing and alleviating the symptoms of a host of both common diseases and extraordinary illnesses.

113.    Several of Defendants' top distributors are also medical doctors, such as Dr. Barnet Meltzer and Dr. John Edwards, who market the Products using health claims and by citing their medical backgrounds to give credence to their claims about the Products.  Dr. John Edwards specifically states that the Products can help with diabetes, blood pressure, cholesterol, arthritis, and certain cancers.

114.    A rudimentary internet search using the search engine Google.com reveals that dozens of webpages set up by Defendants' distributors, with the knowledge, consent, and aid of Defendants, advertise the Products using unlawful health claims and testimonials.

115.    A webpage titled www.discovervemma.org has an entire section dedicated to testimonial touting "REAL stories from REAL people about how the Vemma formula helped with their health!"  The testimonials are grouped (in alphabetical order) according to the names of common diseases and health complications, such as Acid Reflux, ADD/ADHD, Animal Care, Anxiety & Panic Attacks, Arthritis, Asthma, Autism, Blood Pressure, Bursitis, etc.  The testimonials consistently endorse the Products as alleviating and curing such diseases and often claim that the Products are far superior to conventional drugs.

116.    A group on facebook.com titled Vemma Mangosteen (world's Most Powerful Liquid Antioxidant) also contains links to testimonials organized by common diseases, such as Arthritis, Blood Pressure, Cholesterol, Prostate, Psoriasis, and Urinary Tract Infection.

117.     A webpage titled http://thevemmasolution.com claims that scientific studies confirm that mangosteen supplements such as the Products can help with inflammation, joint pain and arthritis, have "anti-cancer effects in terms of liver, lung, and gastric cancer cells," and may help with "Parkinson's, Alzheimer's, Cancer, and Diabetes."

118.     A webpage titled http://vemmajourney.com contains numerous health claims, has subheadings such as "Vemma Nutrition: One Solution For All Health Problems," and contains links to Defendants' official website and videos of Defendant Boreyko directly under many of the unlawful health claims.  For example, the webpage uses the following advertising:



119.     The http://vemmajourney.com webpage states "Do you need more reasons what Vemma can do for your health problems?  Here are more reasons why you should drink Vemma":

| | | |
|---|---|---|
| 1. Powerful Antioxidants | 2. Anti Ageing | 3. Anti Anxiety |
| 4. Anti Arthritic | 5. Anti Depressant | 6. Anti Diabetic Effect |
| 7. Anti Diarrhoea | 8. Anti Fatigue (Energy Booster) | 9. Anti Inflammation |
| 10. Anti Obesity | 11. Anti Osteoporosis | 12. Anti Parkinsonism |
| 13. Anti Seborrhoea (Dandruff) | 14. Anti Tumour and Cancer Prevention | 15. Anti Ulcer (Stomach, Mouth and Bowel Ulcer) |
| 16. Anti Vertigo (Prevent Dizziness) | 17. Helps to Prevent Dementia | 18. Improves The Immune System |
| 19. Lowers Fever | 20. Lowers The Blood Lipids | 21. Modulates Bacteria Infections |
| 22. Prevents Glaucoma | 23. Prevents Viral Infection | 24. Prevents and Arrests Fungal Infections |
| 25. Prevents Hardening of The Arteries | 26. Prevents Gum Disease | 27. Prevents Kidney Stone |
| 28. Prevents Allergic Reaction and Skin Disorder | 29. Prevents Cataract | 30. Protects The Heart |
| 31. Reduces Nerve Pain | 32. Regulates The Blood Pressure (Hypertension) | 33. Relieves Pain |

120. A webpage titled http://vemma-news.blogpost.com is a website wholly dedicated to posting testimonials from customers concerning how the Products help cure or alleviate diseases such as heart disease, diabetes, high blood pressure, thyroid disorder, kidney complications, chronic constipation, high cholesterol, and chronic cough and cold.

121. The FTC Injunction puts an affirmative duty on Defendants to search for distributor advertising online at least once per month. The widespread prevalence of webpages touting illegal health claims and testimonials, including from Defendants' top distributors, confirms that Defendants are in violation of the FTC Injunction, have notice of such advertising, and consent to and aid the unlawful use of health claims to market the Products.

## CLASS ACTION ALLEGATIONS

122. Plaintiff brings this action on behalf of himself and all others similarly situated persons pursuant to Rule 23 of the *Federal Rules of Civil Procedure*.

123.   Plaintiff seeks to represent a Class defined as all persons in the United States who purchased one or more of the Products.  Excluded from the Class are persons or entities that purchased the Products for resale, Defendants and their subsidiaries and affiliates.

124.   Plaintiff seeks to represent a subclass defined as all Class members who are New York residents or who purchased the Products within the State of New York (hereafter, the "New York Subclass").

125.   Members of the Class and New York Subclass are so numerous that joinder of all members is impracticable.  While the exact number of Class and New York Subclass members is presently unknown, and can only be ascertained through appropriate discovery, Plaintiff believes the members of the Class and New York Subclass exceed hundreds of thousands, if not millions of persons.

126.   Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  These common legal and factual questions include, but are not limited to whether Defendants' labeling, advertising, and marketing of the Products is false, misleading, fraudulent, and unlawful as complained herein. Common legal and factual questions further include whether Defendants know of, consent to, are privy to, encourage, aid, and participate in making unlawful health claims.

127.   The claims of the named Plaintiff are typical of the claims of the Class in that Plaintiff (a) was exposed to Defendants' false and misleading labeling, packaging, marketing, and promotion of the Products; (b) relied on Defendants' misrepresentations and omissions; and (c) suffered a loss as a result of his purchase.  Each Class member was subjected to the same conduct, was harmed in the same way, and has claims for relief under the same legal theories.

128.    Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiff and his counsel.

129.    The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## COUNT I

### Violation Of The Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. §§ 2301, *et seq.*

130.    Plaintiff repeats the allegations in the foregoing paragraphs as if fully set forth herein.

131.    Plaintiff brings this Count I individually and on behalf of the members of the Class against Defendants.

132.    The Products are consumer products as defined in 15 U.S.C. § 2301(1).

133.    Plaintiff and Class members are consumers as defined in 15 U.S.C. § 2301(3).

134.    Plaintiff purchased bottles of Vemma Mangosteen with Essential Minerals costing more than $5 and his individual claims are bigger than $25 as required by 15 U.S.C. § 2302(e) and 15 U.S.C. § 2310(d)(3)(A).

135.    Defendants are suppliers and warrantors as defined in 15 U.S.C. § 2301(4) and (5).

136.    In connection with the sale of the Products, Defendants issued written warranties as defined in 15 U.S.C. § 2301(6), such as that the Products are "CLINICALLY STUDIED," are "PHYSICIAN FORMULATED & CLINICALLY STUDIED," and that the "HIGHEST STANDARD OF CLINICAL RESEARCH" proves, among other things, that (1) the Products cause "a significant decrease in C-reactive protein and a significant improvement in immune system function"; (2) the Products reduce C-reactive protein levels from "high risk range" to "low risk range"; (3) the Products caused the "Lowering of C-reactive protein"; (4) the Products "Increase[] ORAC blood levels for 6 hours after intake"; (5) the Products "Increase[] vitamins and antioxidants in the blood"; (6) the Products "Enhance[] Immunity"; (7) the Products "Increase[] overall health status"; (8) the Products are "highly bioavailable"; (9) the Products cause "significant improvement in immune markers"; (10) the Products cause "superior antioxidant absorption"; and that (11) this "gold standard research" "confirms that consuming Vemma daily helps to strengthen the body's natural immune defense, which causes that people taking it maintain their vitality, and enhance quality of life."  In fact, there are no credible studies that "prove" any of Defendants' claims and the consensus of published research confirms that Defendants' claims are false.

137.    Defendants also warrant "The higher the ORAC value, the stronger the compound's capacity and the greater its ability to prevent free-radical damage at the cellular level.  Vemma boasts superior antioxidant protection of over 4,800 ORAC units per serving."

138.    Finally, Defendants warrant that the Products can cure, aid, reduce, and alleviate a host of diseases as described above.

139.    By reason of Defendants' breach of these express written warranties, Defendants violated the statutory rights due Plaintiff and the Class members pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*, thereby damaging Plaintiff and Class members.

140.    Plaintiff served a demand letter on Defendant Vemma Nutrition Company on September 2, 2014, giving notice of the breaches and misrepresentations alleged herein and an opportunity to cure.

## COUNT II

### Deceptive Acts or Practices,
### New York Gen. Bus. Law § 349

141.    Plaintiff repeats the allegations in the foregoing paragraphs as if fully set forth herein.

142.    Plaintiff brings this Count II individually and on behalf of the members of the New York Subclass against Defendants.

143.    Defendants committed unfair or deceptive acts and practices by the acts and conduct alleged herein, such as promising consumers that the Products are "CLINICALLY STUDIED," are "PHYSICIAN FORMULATED & CLINICALLY STUDIED," and that the "HIGHEST STANDARD OF CLINICAL RESEARCH" proves, among other things, that (1) the Products cause "a significant decrease in C-reactive protein and a significant improvement in immune system function"; (2) the Products reduce C-reactive protein levels from "high risk

range" to "low risk range"; (3) the Products caused the "Lowering of C-reactive protein"; (4) the Products "Increase[] ORAC blood levels for 6 hours after intake"; (5) the Products "Increase[] vitamins and antioxidants in the blood"; (6) the Products "Enhance[] Immunity"; (7) the Products "Increase[] overall health status"; (8) the Products are "highly bioavailable"; (9) the Products cause "significant improvement in immune markers"; (10) the Products cause "superior antioxidant absorption"; and that (11) this "gold standard research" "confirms that consuming Vemma daily helps to strengthen the body's natural immune defense, which causes that people taking it maintain their vitality, and enhance quality of life."  In fact, there are no credible studies that "prove" any of Defendants' claims and the consensus of published research confirms that Defendants' claims are false.

144.    Defendants also promised that "The higher the ORAC value, the stronger the compound's capacity and the greater its ability to prevent free-radical damage at the cellular level.  Vemma boasts superior antioxidant protection of over 4,800 ORAC units per serving." Further, Defendants deceive consumers by promising and implying that the Products can cure, aid, reduce, and alleviate a host of diseases as described above.  Each of these representations is false and misleading.

145.    Defendants' foregoing acts were directed at consumers.

146.    Defendants' deceptive acts and practices are misleading in a material way because they fundamentally misrepresent the characteristics and benefits of the Products to induce consumers to purchase same.

147.    In marketing, advertising and promoting the Products to consumers, Plaintiff, and members of the New York Subclass, Defendants made the material misrepresentations and

omissions set forth in this Complaint throughout the United States, including the State of New York.

148.    Plaintiff and members of the New York Subclass were injured because they would not have purchased the Products had they known that the Products were not "CLINICALLY STUDIED" or that there are no credible clinical studies whatsoever that support any of Defendants' claims.  Plaintiff and members of the New York Subclass would not have purchased the Products had they known that each of Defendants' representations based on "clinical studies" was false, including all Defendants' representations concerning the ORAC capacity of the Products.  Plaintiff and members of the New York Subclass were further injured because they would not have purchased the Products had they known that the Products cannot help alleviate, cure, or prevent any disease and that the Products are misbranded.

149.    Plaintiff and members of the New York Subclass purchased the Products in reliance on Defendants' aforementioned representations.

150.    The Products did not have the characteristics and benefits promised by Defendants.

151.    As a result of Defendants' practices as described herein, Plaintiff and members of the New York Subclass have suffered an ascertainable loss of money or property in that: (a) they would not have purchased the Products or would not have purchased the Products on the same terms if the true facts concerning those products had been known; (b) they paid a price premium due to the false representations about the Products; and (c) the Products did not perform as promised.

152.    On behalf of himself and other members of the New York Subclass, Plaintiff

seeks to enjoin the unlawful acts and practices described herein, to recover actual damages or

fifty dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

153.    Plaintiff served a demand letter on Defendant Vemma Nutrition Company on

September 2, 2014, giving notice of the breaches and misrepresentations alleged herein and an

opportunity to cure.

## COUNT III

### False Advertising,
### New York Gen. Bus. Law § 350

154.    Plaintiff repeats the allegations in the foregoing paragraphs as if fully set forth

herein.

155.    Plaintiff brings this Count III individually and on behalf of the members of the

New York Subclass against Defendants.

156.    Based on the foregoing, Defendants engaged in consumer-oriented conduct that is

deceptive or misleading in a material way which constitutes false advertising in violation of

Section 350 of the New York General Business Law.

157.    Defendants' false, misleading and deceptive statements and representations of fact

were and are directed to consumers.  Such deceptive statements include, but are not limited to,

promises that the Products are "CLINICALLY STUDIED," are "PHYSICIAN FORMULATED

& CLINICALLY STUDIED," and that the "HIGHEST STANDARD OF CLINICAL

RESEARCH" proves, among other things, that (1) the Products cause "a significant decrease in

C-reactive protein and a significant improvement in immune system function"; (2) the Products

reduce C-reactive protein levels from "high risk range" to "low risk range"; (3) the Products

caused the "Lowering of C-reactive protein"; (4) the Products "Increase[] ORAC blood levels for

6 hours after intake"; (5) the Products "Increase[] vitamins and antioxidants in the blood"; (6) the Products "Enhance[] Immunity"; (7) the Products "Increase[] overall health status"; (8) the Products are "highly bioavailable"; (9) the Products cause "significant improvement in immune markers"; (10) the Products cause "superior antioxidant absorption"; and that (11) this "gold standard research" "confirms that consuming Vemma daily helps to strengthen the body's natural immune defense, which causes that people taking it maintain their vitality, and enhance quality of life." In fact, there are no credible studies that "prove" any of Defendants' claims and the consensus of published research confirms that Defendants' claims are false.

158. Defendants' false and misleading statements and representations of fact also include a representation that "The higher the ORAC value, the stronger the compound's capacity and the greater its ability to prevent free-radical damage at the cellular level. Vemma boasts superior antioxidant protection of over 4,800 ORAC units per serving." Further, Defendants deceive consumers by promising and implying that the Products can cure, aid, reduce, and alleviate a host of diseases as described above.

159. In marketing, advertising and promoting the Products to consumers, Plaintiff, and members of the New York Subclass, Defendants made the material misrepresentations and omissions set forth in this Complaint throughout the United States, including the State of New York.

160. Defendants' foregoing false, misleading and deceptive and representations of fact were and are likely to mislead a reasonable consumer acting reasonably under the circumstances.

161. Defendants' foregoing false, misleading, and deceptive statements and representations of fact have resulted in consumer injury or harm to the public interest.

162.     Plaintiff and members of the New York Subclass were injured because they would not have purchased the Products had they known that the Products were not "CLINICALLY STUDIED" or that there are no credible clinical studies whatsoever that support any of Defendants' claims.  Plaintiff and members of the New York Subclass would not have purchased the Products had they known that each of Defendants' representations based on "clinical studies" was false, including all Defendants' representations concerning the ORAC capacity of the Products.  Plaintiff and members of the New York Subclass were further injured because they would not have purchased the Products had they known that the Products cannot help alleviate, cure, or prevent any disease and that the Products are misbranded.

163.     Plaintiff and members of the New York Subclass purchased the Products in reliance on Defendants' aforementioned representations.

164.     The Products did not have the characteristics and benefits promised by Defendants.

165.     As a result of Defendants' practices as described herein, Plaintiff and members of the New York Subclass have suffered an ascertainable loss of money or property in that: (a) they would not have purchased the Products or would not have purchased the Products on the same terms if the true facts concerning those products had been known; (b) they paid a price premium due to the false representations about the Products; and (c) the Products did not perform as promised.

166.     On behalf of himself and other members of the New York Subclass, Plaintiff seeks to enjoin the unlawful acts and practices described herein, to recover actual damages or five hundred dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

167.    Plaintiff served a demand letter on Defendant Vemma Nutrition Company on September 2, 2014, giving notice of the breaches and misrepresentations alleged herein and an opportunity to cure.

## COUNT IV

### Breach Of Express Warranty

168.    Plaintiff repeats the allegations in the foregoing paragraphs as if fully set forth herein.

169.    Plaintiff brings this Count IV individually and on behalf of the members of the Class and New York Subclass against Defendants.

170.    Defendants expressly warranted in their marketing, advertising and promotion of the Products that the Products are "CLINICALLY STUDIED," are "PHYSICIAN FORMULATED & CLINICALLY STUDIED," and that the "HIGHEST STANDARD OF CLINICAL RESEARCH" proves, among other things, that (1) the Products cause "a significant decrease in C-reactive protein and a significant improvement in immune system function"; (2) the Products reduce C-reactive protein levels from "high risk range" to "low risk range"; (3) the Products caused the "Lowering of C-reactive protein"; (4) the Products "Increase[] ORAC blood levels for 6 hours after intake"; (5) the Products "Increase[] vitamins and antioxidants in the blood"; (6) the Products "Enhance[] Immunity"; (7) the Products "Increase[] overall health status"; (8) the Products are "highly bioavailable"; (9) the Products cause "significant improvement in immune markers"; (10) the Products cause "superior antioxidant absorption"; and that (11) this "gold standard research" "confirms that consuming Vemma daily helps to strengthen the body's natural immune defense, which causes that people taking it maintain their vitality, and enhance quality of life."

171.     Defendants also warrant "The higher the ORAC value, the stronger the compound's capacity and the greater its ability to prevent free-radical damage at the cellular level.  Vemma boasts superior antioxidant protection of over 4,800 ORAC units per serving."

172.     Finally, Defendants warrant that the Products can cure, aid, reduce, and alleviate a host of diseases as described above.

173.     Defendants breached their express warranties because there are no credible studies that "prove" any of Defendants' claims and the consensus of published research confirms that Defendants' claims are false.  Defendants' warranties concerning ORAC values are false because ORAC values are entirely irrelevant to human health.  Further, the Products cannot cure, aid, reduce, or alleviate any diseases.

174.     As a direct and proximate result of Defendants' breaches of their express warranties, Plaintiff and members of the Class have been damaged in that they did not receive the Products as specifically warranted and/or paid a premium for the Products based on the Defendants' misrepresentations.

175.     Plaintiff served a demand letter on Defendant Vemma Nutrition Company on September 2, 2014, giving notice of the breaches and misrepresentations alleged herein and an opportunity to cure.

## COUNT V

### Unjust Enrichment / Common Law Restitution

176.     Plaintiff repeats the allegations in the foregoing paragraphs as if fully set forth herein.

177.     Plaintiff brings this Count VI individually and on behalf of the members of the Class and New York Subclass against Defendants.

58

178.    Plaintiff and members of the Class and New York Subclass conferred benefits on Defendants by purchasing the Products.

179.    Defendants have knowledge of such benefits.

180.    Defendants have been unjustly enriched in retaining the revenues derived from Plaintiff's and Class and New York Subclass members' purchases of the Products.  Retention of those moneys under these circumstances is unjust and inequitable because Defendants falsely and misleadingly represented that there was clinical proof showing that (1) the Products cause "a significant decrease in C-reactive protein and a significant improvement in immune system function"; (2) the Products reduce C-reactive protein levels from "high risk range" to "low risk range"; (3) the Products caused the "Lowering of C-reactive protein"; (4) the Products "Increase[] ORAC blood levels for 6 hours after intake"; (5) the Products "Increase[] vitamins and antioxidants in the blood"; (6) the Products "Enhance[] Immunity"; (7) the Products "Increase[] overall health status"; (8) the Products are "highly bioavailable"; (9) the Products cause "significant improvement in immune markers"; (10) the Products cause "superior antioxidant absorption"; and that (11) this "gold standard research" "confirms that consuming Vemma daily helps to strengthen the body's natural immune defense, which causes that people taking it maintain their vitality, and enhance quality of life."  Defendants further falsely and misleadingly represented that the Products could cure, aid, reduce, or alleviate diseases.

181.    Defendants' false and misleading misrepresentations caused injuries to Plaintiff and members of the Class and New York Subclass because (a) they would not have purchased the Products or would not have purchased the Products on the same terms if the true facts concerning those products had been known; (b) they paid a price premium due to the false representations about the Products; and (c) the Products did not perform as promised.

182.     Because Defendants' retention of the non-gratuitous benefits conferred on them by Plaintiff and members of the Class and New York Subclass is unjust and inequitable, Defendants must pay restitution to Plaintiff and members of the Class and New York Subclass for their unjust enrichment, as ordered by the Court.

## COUNT VI

### Negligent Misrepresentation

183.     Plaintiff repeats the allegations in the foregoing paragraphs as if fully set forth herein.

184.     Plaintiff brings this Count VII individually and on behalf of the members of the Class and New York Subclass against Defendants.

185.     Defendants represented that there was clinical proof showing that (1) the Products cause "a significant decrease in C-reactive protein and a significant improvement in immune system function"; (2) the Products reduce C-reactive protein levels from "high risk range" to "low risk range"; (3) the Products caused the "Lowering of C-reactive protein"; (4) the Products "Increase[] ORAC blood levels for 6 hours after intake"; (5) the Products "Increase[] vitamins and antioxidants in the blood"; (6) the Products "Enhance[] Immunity"; (7) the Products "Increase[] overall health status"; (8) the Products are "highly bioavailable"; (9) the Products cause "significant improvement in immune markers"; (10) the Products cause "superior antioxidant absorption"; and that (11) this "gold standard research" "confirms that consuming Vemma daily helps to strengthen the body's natural immune defense, which causes that people taking it maintain their vitality, and enhance quality of life."  Defendants also misrepresented that the Products' ORAC value increased the "capacity" and "ability to prevent free-radical

damage at the cellular level," and improved antioxidant protection.  Defendants further falsely and misleadingly represented that the Products could cure, aid, reduce, or alleviate diseases.

186.    Defendants' misrepresented the clinical efficacy and clinical proof of the Products, as there is no clinical proof showing that the Products perform as claimed.  Further, Defendants failed to disclose the serious flaws of their own privately funded studies.  Defendants also failed to disclose that ORAC values have absolutely no relevance to human health.  Defendants misrepresented that the Products can cure, aid, reduce, and alleviate diseases and failed to disclose that such marketing runs directly afoul of federal and state law, thereby making the Products misbranded.  Defendants had a duty to disclose this information.

187.    At the time Defendants made these representations, Defendants knew or should have known that these representations were false or made them without knowledge of their truth or veracity.  At an absolute minimum, Defendants negligently misrepresented and/or negligently omitted material facts about the Products.

188.    The negligent misrepresentations and omissions made by Defendants, upon which Plaintiff and Class and New York Subclass members reasonably and justifiably relied, were intended to induce and actually induced Plaintiff and Class and New York Subclass members to purchase the Products.

189.    Plaintiff and Class and New York Subclass members would not have purchased the Products if the true facts had been known.

190.    Defendants' negligent actions caused damage to Plaintiff and Class and New York Subclass members, who are entitled to damages and other legal and equitable relief as a result.

## COUNT VII

### Fraud – Intentional Misrepresentation and Concealment of Fact

191.    Plaintiff repeats the allegations in the foregoing paragraphs as if fully set forth

herein.

192.    Plaintiff brings this Count VIII individually and on behalf of the members of the

Class and New York Subclass against Defendants.

193.    Defendants intentionally, willfully, falsely, and knowingly uniformly

misrepresented and omitted material facts in writing that relate to the character and quality of the

Products.  Specifically, Defendants intentionally and willfully misrepresented that the Products

are "CLINICALLY STUDIED," are "PHYSICIAN FORMULATED & CLINICALLY

STUDIED," and that the "HIGHEST STANDARD OF CLINICAL RESEARCH" proves,

among other things, that (1) the Products cause "a significant decrease in C-reactive protein and

a significant improvement in immune system function"; (2) the Products reduce C-reactive

protein levels from "high risk range" to "low risk range"; (3) the Products caused the "Lowering

of C-reactive protein"; (4) the Products "Increase[] ORAC blood levels for 6 hours after intake";

(5) the Products "Increase[] vitamins and antioxidants in the blood"; (6) the Products "Enhance[]

Immunity"; (7) the Products "Increase[] overall health status"; (8) the Products are "highly

bioavailable"; (9) the Products cause "significant improvement in immune markers"; (10) the

Products cause "superior antioxidant absorption"; and that (11) this "gold standard research"

"confirms that consuming Vemma daily helps to strengthen the body's natural immune defense,

which causes that people taking it maintain their vitality, and enhance quality of life."  In fact,

there are no credible studies that "prove" any of Defendants' claims and the consensus of

published research confirms that Defendants' claims are false.

194.    Defendants also intentionally and knowingly misrepresented that "The higher the ORAC value, the stronger the compound's capacity and the greater its ability to prevent free-radical damage at the cellular level.  Vemma boasts superior antioxidant protection of over 4,800 ORAC units per serving."  Defendants made such representations concerning ORAC knowing that ORAC values have absolutely no relevance to human health.

195.    Defendants also intentionally and knowingly instructed their distributors to market the Products using illegal health claims and statements touting that the Products can cure, aid, reduce, and alleviate a host of diseases as described above.  Defendants made such representations fully aware that such violates violate the FTC Injunction issued against them, are patently false, and misbrand the Products under federal and state law.

196.    Defendants' uniform written misrepresentations were made with the intent that the general public, including Plaintiff and the putative Class and New York Subclass, would rely upon them.  Defendants' representations were made with knowledge of the falsity of such statements, or in reckless disregard of the truth thereof, and gave Defendants an unjust advantage and caused a loss to Plaintiff and putative class members.  Defendants' claims of clinical proof, clinical efficacy, and the ability to help cure, aid, reduce, and alleviate diseases are so central to the consumer's selection of the Products that Defendants knew and intended that consumers would rely on those misrepresentations in determining whether to purchase the Products.

197.    In actual and reasonable reliance upon Defendants' misrepresentations and omission of material fact, Plaintiff and putative class members purchased the Products for their advertised, intended and reasonably foreseeable purposes.  Plaintiff and putative class members were unaware that there were in fact no reliable studies and no clinical proof affirming any of Defendants' representations and, further, that the Products could not aid, alleviate, prevent, or

cure disease.  If Plaintiff and putative class members had been aware of the concealed facts, Plaintiff and the putative class members would not have purchased the Products at all of for the premium price paid.  Plaintiff's and putative class members' reliance on the representations of the Defendants was reasonable.

198.    Defendants misrepresented material facts with the intent to defraud Plaintiff and the putative class members.  Plaintiff and the putative class members were unaware of the intent of Defendants and relied upon these representations in agreeing to purchase the Products.

199.    In actual and reasonable reliance upon Defendants' misrepresentations, Plaintiff and putative class members purchased the Products and did not benefit from the Products as represented, the direct and proximate result of which was injury and harm to Plaintiff and putative class members because (a) they would not have purchased the Products or would not have purchased the Products on the same terms if the true facts concerning those products had been known; (b) they paid a price premium due to the false representations about the Products; and (c) the Products did not (and cannot) perform as promised.

## PRAYER FOR RELIEF

200.    Plaintiff, on his own behalf and on behalf of the Class and New York Subclass, prays for the following relief:

A. For an order certifying the nationwide Class and New York Subclass under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as Class Representative and his attorneys as Class counsel to represent the putative class members;

B. For an order finding in favor of Plaintiff, the Class, and New York Subclass on all counts asserted herein;

C.  For an order awarding compensatory, treble, and punitive damages in amounts to be determined by the Court and/or jury;

D.  For prejudgment interest on all amounts awarded;

E.  For an order of restitution and all other forms of equitable monetary relief;

F.  For an order awarding Plaintiff and the Class and New York Subclass their reasonable attorneys' fees and expenses and costs of suit.

## JURY DEMAND

Plaintiff demands trial by jury on all issues herein stated.

Dated:  October 22, 2014                    Respectfully submitted,

                                            BURSOR & FISHER, P.A.

                            By:      /s/ Yitzchak Kopel

                                     Yitzchak Kopel (518972)
                                     888 Seventh Avenue
                                     New York, NY 10019
                                     Telephone:  (646) 837-7150
                                     Facsimile:   (212) 989-9163
                                     Email:       ykopel@bursor.com

                                     *Attorneys for Plaintiff*